UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
JOHN H. STIEHL,                                          :
                                                        :
                    Plaintiff,                          :
                                                        :          **OPINION AND ORDER**
          -against-                                     :
                                                        :          No. 08-CV-10498 (CS)
GAIL BAILEY, M.D., "JOHN" BACCAY, M.D.,                  :
JUNE YAZZO, "JOHN" HIMMERDINGER,                         :
M.D., WESTCHESTER COUNTY HEALTH CARE                     :
CORPORATION and the COUNTY OF                            :
WESTCHESTER, NEW YORK,                                   :
                                                        :
                    Defendants.                         :
-------------------------------------------------------------------x

Appearances:

Jonathan Lovett
Law Office of Jonathan Lovett
Hawthorne, New York
*Counsel for Plaintiff*

Irma W. Cosgriff
Westchester County Attorney's Office
White Plains, New York
*Counsel for Defendants*


Seibel, J.

        Before the Court is the Motion for Summary Judgment of Defendants Gail Bailey, M.D.,

Francis "John" Baccay, M.D., June Yozzo,[1] Steven "John" Hemmerdinger, M.D.[2] (collectively,

the "Individual Defendants"), Westchester County Health Care Corporation ("WCHCC"), and

---

[1] Plaintiff's and Defendants' papers do not spell Defendant Yozzo's name consistently. The SAC caption and Plaintiff's Memorandum of Law reflect that it should be spelled "Yazzo," while Defendants refer to her as "Yozzo." For purposes of this Opinion, I spell her name as Defendants do.

[2] Likewise, Plaintiff's and Defendants' papers do not spell Defendant Hemmerdinger's name consistently. The SAC caption reflects that it should be spelled "Himmerdinger," Plaintiff refers to this Defendant as "Hemmerdinger" in his Memorandum of Law, and Defendants refer to him as "Hemmerdinger." For purposes of this Opinion I also spell this name as Defendants do.

the County of Westchester (collectively, with the Individual Defendants, the "County

Defendants"), (Doc. 45), seeking dismissal of Plaintiff John H. Stiehl's Second Amended

Complaint ("SAC"), (Doc. 33).  For the following reasons, the Motion is GRANTED.

## I.    BACKGROUND

All facts are undisputed unless otherwise noted.

Plaintiff was incarcerated at the Westchester County Department of Corrections

("WCDOC") from September 2007 through September 5, 2008.  (Ds' 56.1 ¶ 3.)[3]  During that

time, Plaintiff suffered from various medical ailments for which he sought medical attention,

including the condition underlying the instant action.  (*See generally* Cosgriff Decl. Ex. C

(medical forms and evaluations).)[4]  Among the individuals who administered the challenged

medical care to Plaintiff during the term of his incarceration are Bailey, the Medical Director for

Correctional Health Services,[5] whose job it was, among other things, to review the notes of all

medical consultations for appropriateness and to make referrals as necessary; Baccay, a general

surgeon who provided care to inmates at WCDOC; Yozzo, a licensed nurse and the Health

Services Coordinator at WCDOC; and Hemmerdinger, an Ear Nose and Throat ("ENT")

specialist at Westchester Medical Center, who also treated WCDOC inmates.  (Ds' 56.1 ¶¶ 4,

6-8.)  The County of Westchester is legally responsible for the provision of medical care to

---

[3] "Ds' 56.1" refers to the County Defendants' Rule 56.1 Statement.  (Doc. 46.)

[4] "Cosgriff Decl." refers to the Declaration of Irma W. Cosgriff in support of Defendants' Motion for Summary Judgment.  (Doc. 58.)

[5] "[WCDOC] has designated Correctional Health Services as the *health* authority responsible for health care services.  The Director of Correctional Health Services is designated as the responsible health authority.  The responsibility for providing and coordinating all health care services, including medical and mental health, rests with Correctional Health Services and is defined by written contract."  (Cosgriff Decl. Ex. M, at 10 (emphasis in original); *see also* Examination Before Trial of Gail Bailey-Wallace ("Bailey Dep."), (Cosgriff Decl. Ex. E; Affirmation of Jonathan Lovett in Opposition to Defendants' Motion for Summary Judgment ("Lovett Aff."), (Doc. 50), Ex. 7), 7 (Correctional Health Services is "the agency which is contracted [through Westchester Medical Center] to provide healthcare to inmates.").)

inmates incarcerated at WCDOC, and WCHCC, a public benefit corporation,[6] and the Individual

Defendants provide medical care to WCDOC inmates under a contract with the County of

Westchester.  (SAC ¶¶ 8-9.)

WCDOC inmates are able to access routine and urgent medical attention at the facility by

completing "sick call request" forms, which are collected each day by WCDOC staff members.

(Ds' 56.1 ¶ 9; *see* Cosgriff Decl. Ex. M, at 7-8; Cosgriff Decl. Ex. N, at 118-20.)  The sick call

requests are then triaged by a mid-level medical service provider who determines whether

inmates should be seen on an immediate or a routine basis.  (Ds' 56.1 ¶ 10.)  During his

incarceration at WCDOC, Plaintiff filed myriad sick call requests, and medical care providers

evaluated him for various conditions, including for his eyesight, an injured foot, a "neck boil,"

insomnia, a sinus infection, pain in his waist, and a growth on his face.  (*See* Ds' 56.1 ¶¶ 11-17;

*see generally* Cosgriff Decl. Ex. C.)

On or about January 8, 2008, Plaintiff submitted a sick call request regarding a sinus

infection, and Nurse Practitioner Matthew Cichon treated Plaintiff on or about January 9, 2008

for the condition.  (P's 56.1 ¶ 48;[7] Cosgriff Decl. Ex. C, at 000066.)  Unrelated to the sinus

infection, Cichon noted on the sick call request form that Plaintiff had a "1 cm mobile, nontender

. . . mass" on the right side of his nose, and that Plaintiff was told "to monitor the size of [the]

---

[6] Neither party provides much information concerning WCHCC or its role in providing health care to inmates at WCDOC, but the Second Circuit described WCHCC in another case as

> a public benefit corporation created by the state of New York in 1997 to perform the 'essential public and governmental function' of operating the Westchester County Medical Center ("WMC"), a hospital in Valhalla, New York.  *See* N.Y. Pub. Auth. Law §§ 3300[-3321]. WCHCC's enabling statute endowed it with broad and comprehensive powers, as well as the flexibility to provide health and medical services for the public either directly or by agreement with other entities or individuals, and to determine its own internal policies, including those governing the practice of medicine within WMC. *Id.*

*LaFaro v. N.Y. Cardiothoracic Grp., PLLC,* 570 F.3d 471, 474 (2d Cir. 2009).

[7] "P's 56.1" refers to Plaintiff's 56.1 Statement and Counterstatement.  (Doc. 52.)

mass and to RTC [return to the clinic] if pain or increase in size." (Cosgriff Decl. Ex. C, at 000066.) The mass was situated on Plaintiff's face approximately one inch from his right eye. (P's 56.1 ¶ 48; P's Aff. ¶ 2.[8])

On or about February 2, 2008, Plaintiff submitted another routine sick call request that stated, "I have a growth on my face that's painful and is blurring my vision." (Ds' 56.1 ¶ 18; Cosgriff Decl. Ex. C, at 000065.) Plaintiff was seen by Nurse Practitioner Tracy James on February 11, 2008 who measured the growth and classified Plaintiff's malady as "1 cm soft cyst like appearance on Rt side of face. Mild pain . . . . no color changes. No Vision changes." (Ds' 56.1 ¶ 18; Cosgriff Decl. Ex. C, at 000065.) She determined that "no intervention [was needed] at th[at] time," and that Plaintiff should "RTC for worsening symptoms." (Ds' 56.1 ¶ 18; Cosgriff Decl. Ex. C, at 000065.)

Nearly two months later, on or about March 25, 2008, Plaintiff submitted another sick call request regarding a "Movable cyst right side of nose. Getting Big," and James evaluated Plaintiff the next day. (Ds' 56.1 ¶ 19; Cosgriff Decl. Ex. C, at 000068.) After the consultation, James noted on Plaintiff's sick call request form, "1 ½ cm mobile, non-tender, soft cyst between right side of nose and cheeck [sic]. Above cyst was only 1 cm in 2/08. [Increas]ing in size," and that Plaintiff should be referred for a "surgical consult." (Ds' 56.1 ¶ 19; Cosgriff Decl. Ex. C, at 000068.) Bailey, whose job it was to look at consultation notes and to determine and/or approve next steps, decided that the surgical consult should be deferred. (Ds' 56.1 ¶ 20; Bailey Dep. 30.) Although Bailey does not remember James's specific referral for a surgical consult relating to Plaintiff's growth, her "routine is that if someone puts in a consult and the information on the consult is not enough, then [Bailey] will call the practitioner to get some clarification." (Bailey

---

[8] "P's Aff." refers to Plaintiff's Affidavit in Opposition to Defendants' Motion for Summary Judgment. (Doc. 53.)

Dep. 29.)  Bailey believes that she discussed this referral with James and "[c]hances are whatever [Bailey] was told was not sufficient to warrant the referral" at that time.  (Bailey Dep. 30; *see* Cosgriff Decl. Ex. C, at 000094 (Bailey's notes stating, "Lesion not cystic.  No need for surgical referral."); P's 56.1 ¶ 59 (same).)

On or about April 7, 2008, Plaintiff submitted another sick call request claiming, "I've got a growth on the side of my nose that bothers my being.  I've made numerous request [*sic*] to no help.  Lawyer time," and was seen the next day by Nurse Practitioner Jean Kadel.  (Ds' 56.1 ¶ 21; Cosgriff Decl. Ex. C, at 000069.)  Plaintiff told Kadel that he wanted the cyst removed, but Kadel advised Plaintiff that the previous surgical consult had been denied and to return to the clinic if the cyst changed or enlarged.  (Ds' 56.1 ¶ 21; Cosgriff Decl. Ex. C, at 000069.)  Plaintiff claims that during this consultation, Kadel told him that removing the mass "would cost $150,000 to fix and it wasn't worth it."  (P's 56.1 ¶ 69; Lovett Aff. Ex. 15, at 12.)  Kadel denied making such a representation to Plaintiff, stating that she did not even know how much the surgery would have cost.  (Kadel Dep. 10.)[9]

On or about April 18, 2008, Plaintiff submitted an urgent sick call request, this time stating, "I have a bump to the R side of my face.  It blocks my vision now.  Its [*sic*] grown in the last 2 ½ weeks."  (Ds' 56.1 ¶ 22; P's 56.1 ¶ 71; Cosgriff Decl. Ex. C, at 000071.)  At the examination completed by Nurse Practitioner Salina N. Nordstrom, Plaintiff denied any recent skin disorders or trauma to, or drainage or tenderness in, the affected area.  (Cosgriff Decl. Ex. C, at 000071.)  Nordstrom noted that Plaintiff suffered from an approximately three centimeter raised mass that was purplish in color with an irregular border.  (Ds' 56.1 ¶ 22; Cosgriff Decl.

---

[9] "Kadel Dep." refers to the Examination Before Trial of Jean R. Kadel.  (Cosgriff Decl. Ex. J; Reply Declaration of Irma W. Cosgriff ("Reply Decl."), (Doc. 55), Ex. Y; Lovett Aff. Ex. 9.)

Ex. C, at 000071.)  Nordstrom's plan for Plaintiff was to order an ultrasound of the area to

determine the extent and size of the cyst.   (Ds' 56.1 ¶ 22; Cosgriff Decl. Ex. C, at 000071.)

Plaintiff submitted his next sick call request on May 15, 2008, this time stating that the

mass was starting to hurt his right eye.  (Ds' 56.1 ¶ 23; Cosgriff Decl. Ex. C, at 000073.)

Nordstrom examined Plaintiff and subsequently, as documented in her notes, recommended to

Bailey that Bailey set up a surgery consult for further evaluation of Plaintiff's mass.  (Ds' 56.1 ¶

23; Cosgriff Decl. Ex. C, at 000073.)

On or about May 28, 2008, Plaintiff submitted a sick call request stating, "I want this

growth on my nose Biopsyed [sic] ultrasound anything.  I've been denied treatment."  (Ds' 56.1

¶ 24; Cosgriff Decl. Ex. C, at 000075.)  Although it is unclear from the notes whether Nordstrom

examined Plaintiff again, her notes state that she saw Plaintiff in the hallway and told him that

the medical staff had set up a surgery consult and an ultrasound for him on June 12, 2008.  (Ds'

56.1 ¶ 24; Cosgriff Decl. Ex. C, at 000075; see id. at 0000006.)

Yozzo, who was employed as a "medical contract monitor" at WCDOC,[10] (Yozzo Dep.

7), first got involved with Plaintiff when she received a phone call on May 29, 2008 from

Plaintiff's counselor from the Solutions Program – an alcohol and drug program for inmates –

about Plaintiff's concerns regarding the mass on his nose and the medical care he was receiving,

(Ds' 56.1 ¶ 7 n.5; Yozzo Dep. 13-14).  After she received that call, Yozzo reviewed Plaintiff's

medical records from the time he was incarcerated up until May 29, determined that she needed

to find out whether Plaintiff had received proper medical care and whether he was being referred

to other doctors if necessary, and then met with Plaintiff in his housing unit on May 29.  (See

Yozzo Dep. 14-17.)  Yozzo told Plaintiff that she would follow up with him and would be

---

[10] Yozzo explained that her job responsibilities included, among other things, ensuring that the WCHCC complied with its contract with the County of Westchester, and acting as a liaison for inmates' attorneys and family members. (Examination Before Trial of June Yozzo ("Yozzo Dep."), (Cosgriff Decl. Ex. G; Lovett Aff. Ex. 6), 7-8.)

available in the event that he needed her assistance. (*Id.* at 17.) The next day, the Commissioner

of WCDOC, Rocco Pozzi, gave Yozzo a letter from Plaintiff's girlfriend, Lisa Clark, in which

Clark complained about the level of care that Plaintiff was receiving.[11] (P's 56.1 ¶ 72; *see* Yozzo

Dep. 12, 17-18; P's March 2 Dep. 65-66.) Yozzo told Commissioner Pozzi that she had met

with Plaintiff the previous day, and that she would check with Bailey to determine the status of

Plaintiff's medical care. (Yozzo Dep. 18.) From May 29, 2008 to September 2008, Yozzo

periodically looked at Plaintiff's medical records, followed up with Plaintiff's Solutions

counselor, met with Baccay, and spoke with Plaintiff approximately ten times concerning his

growth and the medical care he was receiving. (*Id.* at 22, 24.)[12]

On or about June 4, 2008, Plaintiff submitted another routine sick call request and was

seen on June 6, 2008 by Nurse Practitioner Maria Taylor who determined that Plaintiff's mass

was a neoplasm[13] that did not have an irregular border, and noted on the sick call request form

that a surgical consult had previously been scheduled. (Ds' 56.1 ¶ 25; P's 56.1 ¶ 70; Cosgriff

Decl. Ex. C, at 000077; Lovett Aff. Ex. 13, at 13-14.)

On or about June 12, 2008, Baccay completed a surgical consult on Plaintiff. (Ds' 56.1 ¶

26; *see* Cosgriff Decl. Ex. C, at 000078, 000098.) Plaintiff claims that Baccay told him during

this consult that the mass "looks like cancer in your face, and by the way, it is near your brain, so

---

[11] Plaintiff alleges that Yozzo advised him, "if you can stop writing letters, we will get you some help, we will get you some medical treatment," (P's 56.1 ¶ 72; Plaintiff's March 2, 2010 Examination Before Trial ("P's March 2 Dep."), (Cosgriff Decl. Ex. D; Reply Decl. Ex. S; Lovett Aff. Ex. 16), 66), but Yozzo stated that she told Plaintiff that if he had further concerns, he should direct his letters to her, rather than to Commissioner Pozzi, (*see* Yozzo Dep. 23).

[12] Although Yozzo is a registered nurse, she did not partake in any medical decisions or direct provision of medical care to Plaintiff, but rather acted as a liaison between Plaintiff and those engaged in Plaintiff's medical care. (*See* Ds' 56.1 ¶ 7.)

[13] Taylor explained that a neoplasm could be malignant or benign. She defined a neoplasm by stating, "It could be a cyst. It could be a tumor. It could be anything. It's new. It's something that's new and hadn't been there in the past." (Lovett Ex. 13, at 15.)

the likelihood is that it will spread to your brain and you will end up dying." (P's 56.1 ¶ 57; P's March 2 Dep. 72.) Baccay denies that he ever made those statements. (Baccay Aff. ¶ 7.)[14] Baccay's notes from the consult include a hand-drawn picture of the positioning of the mass on Plaintiff's face, supplemented by descriptors of the mass, including its size (1.5 x 1.5 cm) and other relevant information (skin intact; purplish hue). (Cosgriff Decl. Ex. C, at 000098.) Based on Plaintiff's representations that the mass was getting bigger and not going away, Baccay's plan for Plaintiff was (1) surgical oncology, (2) plastic surgery, and then (3) return to Baccay as the need arises. (*Id.*) Baccay believed that if the mass had to be removed, "[d]ue to the location of the lesion, it was out of [his] realm of surgical knowledge to be able to handle th[e] procedure." (Lovett Aff. Ex. 10, at 14-15; *see* Bailey Dep. 37 (Bailey aware that Baccay was uncomfortable performing excision on Plaintiff's face).)

On or about June 14, 2008, Plaintiff submitted an urgent sick call request. (Ds' 56.1 ¶ 27; Cosgriff Decl. Ex. C, at 000079.) According to the sick call notes, after the clinician determined that there had been no significant change to the mass and that there was no discharge from it, Plaintiff was sent back to the jail to await notice from Oncology or Plastic Surgery ("Plastics"). (Ds' 56.1 ¶ 27; Cosgriff Decl. Ex. C, at 000079.)

On or about June 16, 2008, Bailey signed off for Plaintiff to see a specialist for further evaluation. (*See* Bailey Dep. 56-57; Cosgriff Decl. Ex. C, at 000098.) Lisa Zacchio, Quality Care Coordinator at Westchester Medical Center, called Dr. Ahmed of Oncology to arrange an appointment for Plaintiff, but Ahmed advised Zacchio that Plaintiff should be seen by an ENT before seeing a doctor in Oncology. (Ds' 56.1 ¶ 28; Cosgriff Decl. Ex. C, at 000079.) According to the notes, Zacchio spoke with Hemmerdinger's office that same day and obtained

---

[14] "Baccay Aff." refers to the Affidavit of Francis Baccay, M.D. in support of Defendants' Motion for Summary Judgment. (Reply Decl. Ex. V.)

an appointment with Hemmerdinger, an ENT, on June 24, 2008. (Ds' 56.1 ¶ 28; Cosgriff Decl. Ex. C, at 000079; *see id.* at 000005.)

On or about June 24, 2008, in preparation for Plaintiff's ENT appointment, Kadel administered various blood tests on Plaintiff, which tests appeared within normal limits, thereby enabling Plaintiff to be scheduled for a CT Scan with IV contrast. (Ds' 56.1 ¶ 29; Cosgriff Decl. Ex. C, at 000081.) On that same day, Hemmerdinger examined Plaintiff and found a "2 cm mass . . . mobile nontender," evaluated Plaintiff's complaint that he had difficulty breathing, and ordered a CT scan with IV contrast for July 3, 2008 to determine the type of growth that was on Plaintiff's face. (Ds' 56.1 ¶ 30; P's 56.1 ¶ 58; Cosgriff Decl. Ex. C, at 000083, 000101, 000105; Kadel Dep. 14; *see also* Hemmerdinger Dep. 24[15] (Hemmerdinger reading his consult notes, which stated "Follow up CT, no extension, 1.5 centimeter right nasal facial groove cyst consistent with right facial sebaceous cyst. . . . Field solid, not completely fluid filled. . . . IMP, or impression, for excision, booked and consented, right facial cyst.").) Hemmerdinger determined that Plaintiff's difficulty breathing likely related to a deviated septum, not the mass, because "[n]o intranasal mass was seen." (Hemmerdinger Aff. ¶ 5.)[16]

Yozzo ensured that on or about June 27, 2008 Plaintiff had blood drawn in preparation for his CT scan, (Yozzo Dep. 25; Ds' 56.1 ¶ 31; Cosgriff Decl. Ex. C, at 000084), and then on July 2, 2008 Plaintiff was admitted to the WCDOC infirmary so that he did not eat or drink anything before the CT scan, (Ds' 56.1 ¶ 32; Yozzo Dep. 25; Cosgriff Decl. Ex. C, at 000084), which was completed on July 3, 2008, (Ds' 56.1 ¶ 33; Cosgriff Decl. Ex. C, at 000085). The radiologist who read the CT scan concluded that Plaintiff "probably" had "a sebaceous gland

---

[15] "Hemmerdinger Dep." refers to the Examination Before Trial of Dr. Steven Hemmerdinger. (Lovett Aff. Ex. 8.)

[16] "Hemmerdinger Aff." refers to the Affidavit of Steven Hemmerdinger, M.D. in support of Defendants' Motion for Summary Judgment. (Reply Decl. Ex. T.)

cyst," (Ds' 56.1 ¶ 33; Cosgriff Decl. Ex. C, at 000126), and Hemmerdinger noted that the mass had no obvious connection to the intransal area, the orbit, or the brain, (Hemmerdinger Aff. ¶ 8).

Kadel saw Plaintiff on or about July 7, 2008 regarding the "probable sebaceous gland cyst" and requested in her notes to Bailey, "Please do an Aspiration Biopsy if possible," to determine whether there were malignant cells in the cyst.  (Cosgriff Decl. Ex. C, at 000106; Kadel Dep. 19.)  On July 15, 2008, Bailey apparently denied Kadel's request; according to Yozzo, Bailey told her on that date that there was "[n]othing to be done," (P's 56.1 ¶ 66; Yozzo Dep. 61), but Bailey did not recall having a conversation with Yozzo about this request, (Bailey Dep. 107-08).  Sometime shortly after July 15, 2008, Yozzo followed up with Commissioner Pozzi, who, along with the Board of Legislators, had been inquiring about the medical attention that WCDOC practitioners had been giving to Plaintiff's growth.  (Yozzo Dep. 61-62.)  Yozzo explained to Jeannie Cloidt, Commissioner Pozzi's secretary, that per Bailey's recommendation, nothing was going to be done at that time.  (*Id.* at 62.)

On or about July 20, 2008, Plaintiff submitted another sick call request, which stated, "I'm in need of medical attention, [t]his groth [*sic*] is Bothrring [*sic*] my right eye."  (Ds' 56.1 ¶ 34; Cosgriff Decl. Ex. C, at 000087.)  The next day Kadel ran into Plaintiff, who inquired about whether he was going to have a biopsy, and Kadel advised him that a surgical consult was "in the works."  (Ds' 56.1 ¶ 34; Cosgriff Decl. Ex. C, at 000087.)

Even though Bailey seemingly had denied Kadel's biopsy request on July 15, 2008, she nonetheless scheduled an appointment with Baccay, who examined Plaintiff again on or about July 30, 2008.  (Ds' 56.1 ¶ 35; Yozzo Aff. ¶ 10 n.3.[17])  Bailey knew Baccay would not do an excision but thought he might do an aspiration (needle) biopsy if the growth was only a cyst.

---

[17] "Yozzo Aff." refers to the Affidavit of June Yozzo in support of Defendants' Motion for Summary Judgment. (Reply Decl. Ex. R.)

(Bailey Dep. 37-39; *see* Kadel Dep. 14 (Kadel thought general surgeon (Baccay) would do an aspiration biopsy because the CT scan report indicated the growth was a cyst).)  Baccay's notes from that consultation reveal that he determined that Plaintiff had been seen by an ENT and had a sebaceous cyst, and that "[g]iven [the] location of [the] lesion on [the] face," Baccay would "defer further treatment to . . . ENT/Plastics." (Ds' 56.1 ¶ 35; Cosgriff Decl. Ex. C, at 000106; *see* Yozzo Dep. 37-38 (Yozzo met with Baccay, during which meeting Baccay told her that because he was only a general surgeon without expertise in facial cysts, it would be a liability for him to perform the procedure).)  Plaintiff claims that Baccay said that "he would not touch John Stiehl insofar as doing a needle-biopsy aspiration," (P's 56.1 ¶ 57 (internal quotation marks omitted)), but Baccay states that he never reported that he would not touch Plaintiff, (Baccay Aff. ¶ 8; *see also* Bailey Dep. 38-39 (Baccay never said that he would not touch Plaintiff; "Baccay, he's a general surgeon.  There are things he can do, but in our setting he's less likely to do certain things because patients are very litigious and he is not comfortable exposing himself.")).  Rather, Baccay claims that "[s]ince the mass was located in [Plaintiff's] facial area near his nose, [he] did not have the expertise to perform the biopsy so [he] referred [Plaintiff] to surgical oncology or plastic surgery." (Baccay Aff. ¶ 8; *see also* Yozzo Dep. 37 (In Yozzo's opinion, when Baccay declined to perform the biopsy, "he[] deferr[ed] it to ENT or plastics, the more appropriate avenue.").)  The August 1, 2008 notes of Nurse Practitioner Sandy George state that Plaintiff had been "[s]een by surgery [who was] unable to remove sebaceous cyst. Referred to ENT as per surgery recommendations." (Cosgriff Decl. Ex. C, at 000088; *see id.* at 000108 (same).)

On or about August 5, 2008, Hemmerdinger examined Plaintiff again.  (Ds' 56.1 ¶ 36; Cosgriff Decl. Ex. C, at 000109; *see id.* at 000089.)  Hemmerdinger's notes from his evaluation

of Plaintiff reveal that for the first time, a doctor found that the mass was "stable, fe[lt] solid. Not completely fluid filled." (Ds' 56.1 ¶ 37; Cosgriff Decl. Ex. C, at 000109.) Although Hemmerdinger did not do anything at that time to ascertain whether the mass was malignant, he did schedule Plaintiff for surgery. (P's 56.1 ¶ 58; Hemmerdinger Dep. 24-25, 27.) But because Hemmerdinger did not believe that Plaintiff required emergency surgery, (Hemmerdinger Aff. ¶ 12), the coordinator for surgery told Nordstrom that she would call within two weeks to schedule Plaintiff's surgery, (Ds' 56.1 ¶ 36; Cosgriff Decl. Ex. C, at 000089, 000162). On the same day, Bailey was also informed that WCDOC would receive a call within two weeks with a possible date for Plaintiff's surgery. (Cosgriff Decl. Ex. C, at 000109.)

On or about August 7, 2008, Plaintiff submitted another sick call request, which said, "I have chronic headaches. This growth on my nose is getting bigger, I would appreciate some treatment." (Ds' 56.1 ¶ 38; Cosgriff Decl. Ex. C, at 000091.) Cichon saw Plaintiff on August 11, 2008, measured the mass as "1.5 cm x 1.5 cm," noted that Plaintiff denied that he had blurred or double vision, and prescribed Motrin for Plaintiff's headaches. (Ds' 56.1 ¶ 38; Cosgriff Decl. Ex. C, at 000091.)

On or about September 2, 2008, Dr. Randy Goldberg received a packet of information by fax concerning the need for medical clearance for Plaintiff's surgery scheduled with Hemmerdinger on September 15, 2008, (*see* Cosgriff Decl. Ex. C, at 000164-75), and Yozzo advised Plaintiff that that surgery had been scheduled, (P's March 2 Dep. 81), but Plaintiff was not apprised of the exact date, (*see* Yozzo Aff. ¶ 12 n.4 ("For security reasons, inmates are not informed in advance of any off site visits")). On September 5, 2008, prior to the surgery, Plaintiff was released from WCDOC. (Ds' 56.1 ¶ 39.) The record contains no indication that Plaintiff's doctors were aware that he would be discharged prior to his September 15, 2008

surgery date. (*See* Hemmerdinger Aff. ¶ 10 ("Stiehl was scheduled for an excisional biopsy and I intended to request a frozen section on September 15, 2008. I was never advised that [Plaintiff] was soon to be released or actually released from custody on or about September 5, 2008."); Yozzo Dep. 20-21 (Yozzo was not aware of Plaintiff's release date but understood that Plaintiff had been scheduled for a biopsy that did not occur because he was released prior to the scheduled date).)

Approximately two weeks after his release from WCDOC, Plaintiff went to a private physician, Dr. Mermelstein, concerning the growth. (Ds' 56.1 ¶ 40; P's 56.1 ¶ 81; P's March 2 Dep. 40.) At this first appointment, Mermelstein prescribed "a heavy antibiotic because the growth was very large and infected, and he believed that that would help bring down the infection." (Ds' 56.1 ¶ 40; P's 56.1 ¶ 75; P's March 2 Dep. 40-41.) At Plaintiff's second visit with Mermelstein, the doctor determined that Plaintiff should get a biopsy. (Ds' 56.1 ¶ 40; P's March 2 Dep. 41.) Plaintiff could not recall if he saw Mermelstein one or two more times before he underwent that biopsy on November 3, 2008. (Ds' 56.1 ¶ 40; P's March 2 Dep. 41.) The biopsy revealed that Plaintiff's growth was a basal cell carcinoma, a "slow growing" form of cancer that "rarely metastasizes, and [is] usually not life-threatening," (Lovett Aff. Ex 5; Ds' 56.1 ¶ 41; P's 56.1 ¶ 49; Davis Dep. 8[18]), although on "rare occasions" metastasis can occur if the cancer reaches the orbit of the eye, (P's 56.1 ¶ 50; Davis Dep. 8-9). Mermelstein determined that the mass had to be removed, and Plaintiff scheduled surgery with Dr. Ira Davis, a board certified dermatologist specializing in Mohs micrographic surgery,[19] who excised the approximate "1.4 by 1.07" centimeter growth on January 21, 2009. (Ds' 56.1 ¶ 42; Davis Dep.

---

[18] "Davis Dep." refers to the Examination Before Trial of Dr. Ira C. Davis. (Cosgriff Decl. Ex. I; Lovett Aff. Ex. 14.)

[19] Dr. Davis described the training required for "Mohs micrographic surgery" – "a technique to take off certain kinds of skin cancers" – as "a fellowship sometime after dermatology residency that's approved by the American College of Mohs Surgery and Cutaneous Oncology . . . . There's fellowship training in this procedure." (Davis Dep. 7.)

16.)  The procedure took between five and six hours, including time during which some of the removed tissue was analyzed for cancerous cells.  (P's 56.1 ¶ 54; Davis Dep. 13, 15.)  Plaintiff was then transported to the office of Dr. Samuel Baran, a reconstructive plastic surgeon, who completed an additional approximately two-hour surgery on Plaintiff.  (*See* P's March 2 Dep. 56-58.)  Beran removed pieces of Plaintiff's facial bone that tested positive for cancer.  (P's 56.1 ¶ 56; P's March 2 Dep. 56-58.)  Ten days after surgery, Baran completed a follow-up consultation with Plaintiff to remove sutures and to look at the incision, and noted that he expected Plaintiff to "have an excellent result."  (Cosgriff Decl. Ex. Q.)

Plaintiff filed a Complaint in this Action on December 3, 2008, against the County Defendants and some additional individuals, (Doc. 1), and Plaintiff subsequently amended the Complaint twice, (Docs. 19, 33).  Between the various amendments, the parties stipulated to dismissing certain previously named Defendants, (Docs. 10, 29), and Plaintiff named certain other Defendants who were not sued in the initial Complaint.  Plaintiff brings one claim against all the County Defendants for the "intentional and/or reckless refusal to provide Plaintiff with proper medical care [which] violated his rights as guaranteed by the Eighth Amendment to the United States Constitution, 42 U.S.C. §1983."  (SAC ¶ 41.)

## II.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

14

under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact, and, if satisfied, the burden then shifts to the non-movant "to present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where, as here, an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event a party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the

fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

### B.   Eighth Amendment Deliberate Indifference Claim Against Individual Defendants

"A convicted prisoner's claim of deliberate indifference to his medical needs by those overseeing his care . . . arises from the Eighth Amendment's prohibition of cruel and unusual punishment." *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009) (internal quotation marks omitted); *see West v. Atkins*, 487 U.S. 42, 48 (1988) (Eighth Amendment claim of deliberate indifference actionable under 42 U.S.C. § 1983). While the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care, *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), "not every lapse in medical care is a constitutional wrong. Rather, 'a prison official violates the Eighth Amendment only when two requirements'" – one objective and one subjective – "'are met.'" *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (quoting *Farmer*, 511 U.S. at 834).

First, the prisoner must prove, objectively, that he was "actually deprived of adequate medical care[,] . . . [as] the prison official's duty is only to provide reasonable care," *id.* at 279 (citing *Farmer*, 511 U.S. at 844-47), and "that the alleged deprivation of medical treatment [wa]s . . . 'sufficiently serious' – that is, the prisoner must prove that his medical need was a condition of urgency, one that may produce death, degeneration, or extreme pain," *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (internal quotation marks omitted); *see Williams v. Raimo*, No. 10-CV-245, 2011 WL 6026115, at *3 (N.D.N.Y. July 22, 2011) ("no distinct litmus test" for determining whether medical condition is "serious," but court may look at non-exhaustive list of factors, including whether (1) impairment is one that reasonable doctor would find important and

worthy to treat, (2) condition affects individual's daily life, and (3) prisoner suffers from chronic and substantial pain). Where the inadequacy alleged "is in the medical treatment given, the seriousness inquiry is narrower. . . . [If] the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Goris v. Breslin*, 402 F. App'x 582, 584-85 (2d Cir. 2010) (summary order) (internal citation and quotation marks omitted); *see Smith v. Carpenter*, 316 F.3d 178, 186-87 (2d Cir. 2003) (among other things, court must look at reasons for and effect of delay in treatment).

Second, the prisoner must prove, subjectively, that the charged official acted with a sufficiently culpable state of mind. *Salahuddin*, 467 F.3d at 280-81; *see Farmer*, 511 U.S. at 835 ("[D]eliberate indifference entails something more than mere negligence . . . [but] it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."). The prisoner must prove that the charged official knew of and disregarded "'an excessive risk to inmate health or safety; the official must [have] both be[en] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . must also [have] draw[n] the inference.'" *Johnson*, 412 F.3d at 403 (quoting *Farmer*, 511 U.S. at 837); *see Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002) (per curiam) (equating "deliberate indifference" with criminal "recklessness").

"It is well-established that [neither] mere disagreement over the proper treatment," *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998), nor "[m]edical malpractice . . . become a constitutional violation merely because the victim is a prisoner," *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312

(S.D.N.Y. 2001) ("[D]isagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim.  These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment."); *cf.* *Choice v. Blackwell,* No. 01-CV-1931, 2002 WL 32079466, at *7 (D.S.C. Mar. 29, 2002) ("[A]lthough the provision of medical care by prison officials is not discretionary, the type and amount of medical treatment is discretionary.").  Rather, to state an Eighth Amendment deliberate indifference claim, an inmate "must demonstrate that the defendants act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm w[ould] result." *Farid v. Ellen*, 593 F.3d 233, 248 (2d Cir. 2010) (alterations in original) (internal quotation marks omitted).  "[P]rison officials . . . may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

The County Defendants do not claim that Plaintiff's medical condition was not "serious" within the meaning of the Eighth Amendment.  Rather, they argue that

> [t]o the extent that there was any delay in scheduling Stiehl for a biopsy, it was based upon sound medical principles and not deliberate indifference.  Notably, even after Stiehl was released from WCDOC, Dr. Mermelstein . . . did not order a biopsy until the second or third visit as it was not at all evident that [Plaintiff] was suffering from slow moving basal cell carcinoma.

(Ds' Mem. 6.)[20]  They claim that "the treatment was adequate in all respects" and thus "it is undisputed that County Defendants did not evince a conscious disregard of a substantial risk of serious harm in their provision of medical care to [Plaintiff]." (*Id.* at 7.)  Plaintiff argues that "[t]he record shows that he was placed on a medical merry-go-round that lead [*sic*] no where [*sic*].  There was no interrupted treatment, for there was no treatment at all.  There was no

---

[20] "Ds' Mem." refers to the Memorandum of Law in Support of County Defendants' Motion for Summary Judgment.  (Doc. 57.)

unreasonable delay since no treatment was accorded [him]." (P's Mem. 14.)[21]  Further, Plaintiff

claims that "Bailey and her medical subordinates knew and/or had to know when [he] was to be

released from custody so they simply delayed necessary medical treatment until his incarceration

ended." (*Id.*)

Neither Plaintiff's medical records nor the rest of the record in this case supports

Plaintiff's claim that his medical providers deliberately disregarded a risk of serious harm by

failing to act.  Rather, from January 2008 through September 2008, Plaintiff was seen by doctors

or nurse practitioners regarding his growth approximately sixteen times, and other practitioners

discussed Plaintiff's case with each other, set up consultations with specialists, procured

necessary tests, and scheduled Plaintiff for an excision biopsy.  Over these eight months, the

medical providers were monitoring the size, shape, and color of the mass, as well as any medical

issues relating to it.  Although Plaintiff's CT scan was not conclusive on the issue of whether the

mass was cancerous, the results were not alarming to these medical providers.  Upon Plaintiff's

further complaints, he was channeled to Baccay, a general surgeon who, based on his lack of

expertise related to Plaintiff's condition,[22] then sent Plaintiff to Hemmerdinger, an ENT, for a

consult that was required before Plaintiff was able to see an oncology specialist.  After Kadel

suggested that Plaintiff undergo an aspiration biopsy and Hemmerdinger determined that

Plaintiff should undergo an excision biopsy, Plaintiff was scheduled for surgery with

Hemmerdinger on September 15, 2008.  Plaintiff's discharge from WCDOC ten days before the

scheduled excision biopsy, (Hemmerdinger Aff. ¶ 10) – notably, a procedure that Dr. Davis

---

[21] "P's Mem." refers to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment. (Doc. 51.)

[22] Considering Dr. Davis's representations regarding the training that is required for a physician to complete a Mohs surgery, it appears to the Court that Baccay made a sensible medical decision not to biopsy or excise the cyst.

performed over four months later, which undermines Plaintiff's claim as to the urgency for it –
precluded the County Defendants from completing Plaintiff's medical care as planned.

In fact, aside from Bailey's decision to defer the surgical consult in late March 2008 – a
determination that she made early on with respect to Plaintiff's medical condition after
apparently speaking with the nurse practitioner who evaluated Plaintiff at a time when the mass
was movable, soft, and non-tender – Plaintiff received increasing care as his condition worsened
and he required more specific testing. Bailey approved a CT scan and surgical consults with
Baccay and Hemmerdinger. Once Hemmerdinger saw a change in the make-up of the mass from
soft and non-tender (suggesting a cyst) to stable and solid (possibly suggesting something else),
(*see* Ds' 56.1 ¶ 37; Cosgriff Decl. Ex. C, at 000109; Hemmerdinger Dep. 24-25), Bailey ordered
the biopsy. That it took a few weeks from the time Bailey signed off on the biopsy to the date it
was scheduled does not evince a deliberate indifference to Plaintiff's medical needs,[23] and
Plaintiff fails to set forth evidence to demonstrate that the delay was a result of deliberate
indifference.

Further, Dr. Davis testified that when he first evaluated Plaintiff in November 2008, two
months after Plaintiff was discharged from WCDOC, he did not consider the condition an
emergency, (*see* Davis Dep. 20 ("He had basal cell carcinoma for a year. These are slow-
growing lesions."; not unusual to go to Plastics doctor for consultation and to look into other
options)), which substantiates Hemmerdinger's statement to the same effect, (*see* Hemmerdinger
Aff. ¶ 12 ("If I had thought Stiehl required emergency surgery (which I didn't) I would have sent
him to the Emergency Room on August 5, 2008 or requested immediate surgical scheduling.")).

---

[23] Although not dispositive on this issue, it is informative that Mermelstein – Plaintiff's private doctor – waited until
at least the third, and possibly the fourth, office visit to complete the biopsy.

Additionally, Plaintiff's claims in the SAC, his 56.1 Statement, and his Affidavit that the

mass caused him to "endure excruciating pain and suffering," (SAC ¶ 39; *see also* P's 56.1 ¶¶

76-80 (mass caused difficulty breathing, migraines, and sharp pain; pain in right eye "was

apparently caused by the cancer impinging on a nerve"); P's Aff. ¶ 2 ("persistent pain to my right

eye"; "extreme headaches and migraines"; "When the tumor was not being touched, it exerted a

profound and disconcerting pressure on my right cheek, the right side of my nose and my right

eye."; "During sleep, if I moved in a manner that resulted in the tumor coming into contact with

the bed and/or pillow, it caused me sharp pain in my right eye . . . ."), are largely belied by the

record.  Although Plaintiff did submit sick call requests complaining of some pain and/or of

being bothered by the mass, the complaints were more mild than his current version of the events

suggests, (*see, e.g.*, Cosgriff Decl. Ex. C, at 000065, 000069, 000073, 000087, 000091), and his

own deposition testimony does not substantiate a claim that he was in excessive pain that would

have raised red flags to the medical providers so as to suggest deliberate indifference, (*see* P's

March 2 Dep. 30 ("It was very discomforting.  It started to feel like someone was poking the side

of my nose with their finger . . . ."); *id.* at 33-34 ("Q:  Were you in any pain?  A:  I was in

discomfort.  My vision was bothering me.  My sinuses were bothering me."); *id.* at 43 ("It was

like I said, pressure and . . . it was total discomfort."); *id.* at 61 ("discomfort"; "just a weird

feeling")).  Because Plaintiff may not submit an affidavit in connection with a motion for

summary judgment that conflicts with earlier deposition testimony, *see Ramos v. Baldor

Specialty Foods, Inc.*, No. 10-CV-6271, 2011 WL 2565330, at *4 (S.D.N.Y. June 16, 2011)

(disregarding declaration that contradicted plaintiff's deposition testimony because it had not

been subject to cross-examination and ran afoul of rule that party may not create material issue

of fact on summary judgment by submitting contradictory declarations); *see also Bickerstaff v.*

21

*Vassar Coll.*, 196 F.3d 435, 455 (2d Cir. 1999) ("It is beyond cavil that a party may not create an

issue of fact by submitting an affidavit in opposition to a summary judgment motion that

contradicts the affiant's previous deposition testimony.") (alteration and internal quotation marks

omitted), I must disregard the conflicting portions of Plaintiff's Affidavit and 56.1 Statement

concerning Plaintiff's level of pain.[24]

      Viewing the facts in the light most favorable to Plaintiff and drawing every reasonable

inference in his favor, the evidence as to the medical care rendered, the diagnostic tools used,

and the pace in scheduling diagnostic tests for Plaintiff – including the delay caused by Bailey's

initial judgment that the surgical consult (which ultimately was scheduled less than two months

later) was not warranted, *see Gardner v. Zaunbrecher*, No. 95-CV-1543, 1997 WL 602333, at *2

(N.D.N.Y. Sept. 22, 1997) (doctors disagreed about whether they should perform biopsy on

prisoner's cystic mouth lesions, but "existence of a disagreement as to the proper care and

treatment . . . does not give rise to a constitutional claim"), the delay caused by Baccay's

determination that he was not the appropriate doctor to handle Plaintiff's condition, *see*

*Hernandez v. Keane*, 341 F.3d 137, 146-47 (2d Cir. 2003) (decision to perform or not to perform

a surgery is one of "medical judgment" and "is precisely the sort of issue that cannot form the

basis of a deliberate indifference claim"), and the delay between Hemmerdinger requesting the

biopsy and it being scheduled, *see Pabon v. Wright*, No. 99-CV-2196, 2004 WL 628784, at *8

(S.D.N.Y. Mar. 29, 2004) ("[A] delay in treatment does not violate the constitution unless it

involves an act or failure to act that evinces a conscious disregard of a substantial risk of serious

harm. . . . The Second Circuit has reserved such a classification for cases in which, for example,

---

[24] Further, the doctors' notes are consistent with Plaintiff's deposition testimony and his sick call requests, which suggests that although Plaintiff may have been in some pain and discomfort, it did not rise to the level of "excruciating" such that a reasonable jury could find that the medical providers deliberately disregarded an excessive risk to Plaintiff's health or safety.

officials deliberately delayed medical care as a form of punishment, ignored a life threatening

and fast-degenerating condition for three days, or delayed major surgery for over two years.")

(internal citation and quotation marks omitted) – "implicate medical judgments and, at worst,

negligence amounting to medical malpractice," *Sonds*, 151 F. Supp. 2d at 312, by the

practitioners, which is insufficient to support Plaintiff's Eighth Amendment claim.[25] *Compare*

*Victor v. Milicevic*, No. 03-CV-1294, 2008 WL 907319, at *4 (N.D.N.Y. Mar. 31, 2008) (no

finding of deliberate indifference where there was ten-month delay in receiving liver biopsy that

had previously been recommended by one clinician, but was determined not to be necessary

according to another doctor, and Plaintiff had been treated in ways other than biopsy in interim),

*aff'd*, 361 F. App'x 212, 215 (2d Cir. 2010) ("delay was due to conflicting opinions from

consulting doctors on the proper course of treatment; once the doctors were in agreement that a

liver biopsy was safe, such a biopsy was ordered and performed"), *with Price v. Reilly*, 697 F.

Supp. 2d 344, 361-62 (S.D.N.Y. 2010) (denying defendants' motion for summary judgment

because rational jury could find that defendants acted with deliberate indifference based on over-

nine-month delay in arranging kidney transplant test that plaintiff requested, defendants' failure

to respond to plaintiff's requests, and statement to plaintiff that defendants had "other priorities

right now").

Moreover, with respect to Yozzo, although "[n]on-medical personnel may engage in

deliberate indifference if they intentionally deny or delay access to medical care," *Jean v.*

*Barber*, No. 09-CV-430, 2011 WL 2975218, at *5 (N.D.N.Y. July 21, 2011); *accord Hodge v.*

*Coughlin*, No. 92-CV-622, 1994 WL 519902, at *11 (S.D.N.Y. Sept. 22, 1994) ("[P]laintiff must

---

[25] The Court does not suggest that malpractice occurred. The record here contains support for Defendants' assertion that there was no deprivation of adequate care. I need not reach that issue definitively, however, because the record so convincingly demonstrates that no Defendant consciously disregarded any excessive risk to Plaintiff's health from their decisions.

prove that [nonmedical] prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problems known to the attendant prison personnel or that the inmate suffered a complete denial of medical treatment."), the record is devoid of evidence of any conduct by Yozzo that denied or delayed Plaintiff's access to medical care, let alone that shows she consciously intended that result, (*see, e.g.,* Yozzo Dep. 37 (Yozzo believed Baccay's deferral to ENT or Plastics made sense, as these specialists were "the more appropriate avenue"); *id.* at 42 ("quite self-explanatory as to why [Baccay] wouldn't do the biopsy . . . [and Plaintiff] was referred to ENT Hemmerdinger, who ordered the CAT scan"); *id.* at 61-62 (Yozzo monitored Plaintiff's medical care and passed on information to the Board of Legislators that Bailey denied Plaintiff a biopsy on July 15, 2008), and Plaintiff's own testimony supports such a finding, (*see* P's March 2 Dep. 75-76 ("I don't think Ms. Y[o]zzo tried to prevent me from getting help at the jail. . . . I wouldn't say that she was putting her foot down and trying to trip me from getting help, but I wasn't getting any results.")). That Yozzo personally felt that something did not look right with the mass on Plaintiff's face, (Yozzo Dep. 79), does not mean that she denied or delayed Plaintiff's access to medical care. On the contrary, Yozzo, in her administrative role, was tracking Plaintiff's situation and deferred to the medical providers, who initially disagreed about the course of treatment required for Plaintiff and who later marshaled Plaintiff through a diagnostic process and ultimately the referral to a surgeon for an excision biopsy scheduled for September 15, 2008.

The facts and evidence before the Court simply do not support the type of egregious lack of medical care needed to establish a claim of deliberate indifference by any of the Individual Defendants. On the contrary, although the record demonstrates short periods of delay in the provision of certain diagnostic tests, and a total period of approximately seven months between

24

Plaintiff's first complaint and Defendants' scheduling a biopsy or surgery, the reasons for those delays were reasonable, and Plaintiff's mass was never ignored. Rather, WCDOC medical providers and referred clinicians attended to Plaintiff on a regular basis between February 2008 and his discharge from the facility in September 2008. Although Plaintiff would have wished for the surgery to have been performed sooner, Plaintiff has failed to contradict the extensive record that shows that the evaluation of Plaintiff's condition was continuous and conscientious, and a rational jury thus could not find that the Individual Defendants evinced a deliberate indifference to his condition or that their conduct amounted to anything more than negligence or medical malpractice. *Cf. Thomas v. Wright*, No. 99-CV-2071, 2002 WL 31309190, at \*9 (N.D.N.Y. Oct. 11, 2002) (doctors may have failed "to diagnose or even detect [plaintiff's] cancer, [but] the record does not show that they did so deliberately"; plaintiff was seen numerous times by doctors and given pain medication, and the doctors ordered tests that showed normal results). For these reasons, Defendants' Motion for Summary Judgment is granted with respect to the Individual Defendants.

### C.   Municipal Liability

Plaintiff brings the same Eighth Amendment claim against WCHCC and the County of Westchester as he does against the Individual Defendants. "It is well settled that a municipality may not be held liable where there is no underlying constitutional violation by a municipal official." *Levy v. Alfano*, 47 F. Supp. 2d 488, 498 (S.D.N.Y. 1999); *accord Gonzalez v. City of N.Y.*, No. 99-CV-9128, 2000 WL 1678036, at \*10 (S.D.N.Y. Nov. 8, 2000) ("Because [plaintiff] has failed to show that any of his constitutional rights were violated, all of his claims against the City must fail."). Because none of the Individual Defendants' conduct rose to the level of deliberate indifference within the meaning of the Eighth Amendment, there is no independent

constitutional violation, and thus no basis for municipal liability. *See Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."); *cf. Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992) ("[P]roper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality:  (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation."). Accordingly, Defendants' Motion for Summary Judgment is also granted with respect to WCHCC and the County of Westchester.

**III.    CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending Motion, (Doc. 45), enter judgment in Defendants' favor, and close the case.

**SO ORDERED.**

Dated: June 19, 2012
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.